IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| E.W., by and through her parents and natural guardians, Joseph and Heather Williams; J.W., by and through his parents and natural guardians, Joseph and Heather Williams; JOSEPH WILLIAMS, individually; HEATHER WILLIAMS, individually; and the ROMAN CATHOLIC DIOCESE OF BURLINGTON, VERMONT,<br><br>      *Plaintiffs*,<br><br>v.<br><br>DANIEL M. FRENCH, in his official capacity as Secretary of the Vermont Agency of Education; JEANNÉ COLLINS, in her official capacity as Superintendent of the Rutland Northeast Supervisory Union; and the BARSTOW UNIFIED UNION SCHOOL BOARD OF DIRECTORS,<br><br>      *Defendants*. | Case No. 2:22-CV-59-cr |

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR PRELIMINARY INJUNCTION

INTRODUCTION

The Williams family is deprived of a public benefit that their neighbors enjoy, simply because they choose to send their children to a Catholic school. Despite clear Supreme Court precedent, their school district denied their request to receive Vermont Town Tuition Program benefits because "VT is not bound by [the *Espinoza*] decision" and the "state does not allow" tuition to "go to a private religious school." And despite direction from this Court and the Second Circuit, the district still refuses them equal access to program benefits because their chosen school teaches from a Christian perspective. These actions violate the U.S. Constitution and reflect decades of discrimination.

Defendants' discrimination robs the Williamses and their school of unrecoverable educational opportunities. Their school, Mt. St. Joseph Academy ("MSJ"), is a ministry of the Roman Catholic Diocese of Burlington and it provides financial support to make MSJ affordable for families. Much of this support is only necessary because Defendants exclude religious schools from the program. And every dollar that MSJ provides in subsidies to help families afford the tuition lessens its educational opportunities. Defendants' special burdens on MSJ discourage families from choosing the school.

This month Defendants are releasing another round of benefits. Unless enjoined, Defendants' discrimination against the Williamses and MSJ will continue.

STATEMENT OF FACTS

Joseph and Heather Williams have five children and live in Chittenden, Vermont. Williams Decl. at ¶¶ 2, 4. Their oldest child is a cadet at the U.S. Coast Guard Academy, and their second and third oldest children, Plaintiffs J.W. and E.W., are students at MSJ, a private Catholic high school. *Id.* ¶¶ 4, 6. Their two youngest children are in eighth grade now but will attend MSJ next year. *Id.* ¶ 7.

Chittenden's school district, the Barstow Unified Union School District ("Barstow"), does not have a public high school, so it is required to provide its students with a tuition benefit to use at their chosen school under Vermont's Town Tuition Program. *Id.* ¶ 9; 16 V.S.A. §§ 822-28. Normally, Barstow would pay full tuition at any school chosen by Chittenden parents. 16 V.S.A. § 828. But tuition payments to religious schools halted following a 1999 Vermont Supreme Court decision. *See Chittenden Town Sch. Dist. v. Dep't of Educ.*, 738 A.2d 539, 562 (1999). That case held that Vermont's constitution required the State to adopt "adequate safeguards" to prevent religious schools from using tuition on religious activities. *Id.* But the State never developed such safeguards, so Barstow and other school districts followed the "prevailing practice in Vermont" and excluded religious schools from the program. ECF 1-3 at 18–19 (Barstow tuition policy); *see In re A.H.*, 999 F.3d 98, 103 (2d Cir. 2021) (calling such exclusion unconstitutional). The Williamses and MSJ were out.

In June 2020, the U.S. Supreme Court confirmed that "once a State decides to [subsidize private education], it cannot disqualify some private schools solely because they are religious." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020). Heather Williams learned about the *Espinoza* decision and, quoting Chief Justice Roberts, wrote to her school district to request the tuition benefit for her family for the 2020-21 school year. ECF 1-3 at 8. But the district's Superintendent, Jeanné Collins, took direction from Vermont's Deputy Secretary of Education and denied the request. *Id.* at 7. In her denial email, Collins explained that Vermont "is not bound by that decision," and that the district "cannot yet allow public school funds go to a private religious school" because "[t]he state does not allow it." *Id.*

This is not the first time this Court has confronted this fact pattern. Other Vermont families have also had their tuition requests denied by their school districts simply because the diocesan school they selected for their children is "religious." *See In re A.H.*, 999 F.3d at 103. And like Barstow, after learning about *Espinoza*, those

2

"school districts did not alter course," but instead denied the requests. *Id.* This Court, however, determined that such denials violated the families' and the Diocese's First Amendment rights (*see A.H. by & through Hester v. French*, 511 F. Supp. 3d 482, 501 (D. Vt. 2021)). The Second Circuit explained they were therefore entitled to injunctive relief. *In re A.H.*, 999 F.3d at 107 ("the district court was required to provide a remedy that would restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.") (quotation omitted).

After Heather Williams learned of these additional court rulings, she again requested that Barstow honor her family's tuition requests. ECF 1-3 at 7. And MSJ sent an invoice to the school district for its resident students' tuition. *Id.* at 22–23. But the district looked for ways to avoid providing tuition to the Williamses. First, Defendants responded that they would adopt Defendant French's "adequate safeguards" policy, promulgated in January 2021. *Id.* at 11–12 (response to Williamses' tuition request listing safeguard measures). The adequate safeguards policy restricts tuition benefits given to religious schools by requiring the schools to agree to limit their use of funds or by reducing families' tuition awards to account for the school program's religiosity. *Id.*; ECF 1-1 at 1–3 (Defendant French's policy).

Next, Defendants proposed ending private school choice altogether under the guise of "equity." ECF 1-5 at 37–38. This proposal was designed to target MSJ and religious schools. *Id.* at 41, 45, 47, 50 (parents identifying targeting). But the proposal—announced on Facebook—received fierce public backlash. *Id.* at 37–50 (Facebook post and stakeholder comments). So Defendants dropped it.

Ultimately, Defendants reaffirmed their denial of the Williamses' 2020-21 tuition request. ECF 1-3 at 27–28 (email referring to policy). For the 2021-22 year, Defendants told the Williamses that they would not pay the full tuition billed by MSJ, but would only pay the subsidized tuition rate that MSJ charitably sets for families who pay out-of-pocket. *Id.* at 24. They also added conditions to "payments to religious

3

affiliated institutions" and specifically threatened to enforce the adequate safeguards by reducing or revoking the Williamses' limited tuition award to account for MSJ's religious activities and scholarships if the courts allow it. *Id*. This financial threat leaves the Williamses unable to plan on keeping even the reduced tuition benefit as they are potentially responsible for this year's MSJ tuition. Williams Decl. ¶ 38.

Defendants' denial has a real impact on the Williamses. Added to the ongoing and irreparable First Amendment violations that the Williamses are suffering at Defendants' hands, being excluded from the program has other real-world harms: they cannot provide their children with the college financial assistance they want. *Id*. ¶ 27. The limited help from their parents has meant that the Williams' children have considered fewer colleges because of the costs. *Id*. ¶¶ 27-33. The Williamses' oldest son chose a service academy, in part due to limitations on financial help from his parents. *Id*. ¶ 29. And right now, J.W. is applying for colleges, and the limitations on his family's financial support is impacting his decisions about which schools he can afford to attend. *Id*. ¶¶ 31–32. J.W. will forever lose out on educational opportunities because of these denials. *Id*. ¶ 43.

And Defendants' actions harm MSJ and other religious schools, too. Because MSJ has to subsidize its tuition, in part because it is not permitted to participate in the program as are other private (but secular) schools, it must sacrifice other aspects of its mission. Alexander Decl. ¶ 30. And MSJ is at a distinct competitive disadvantage because full benefits will not be awarded to families who choose religious schools. *Id*. ¶ 55. The uncertainty over the tuition benefit and whether it can be used partially—or at all—at religious schools discourages parents from sending their children to MSJ. *Id*. ¶ 45. These are lost opportunities for MSJ. *Id* ¶ 29. Barstow will make the next round of tuition payments this month, and without this court's help, the Williamses and MSJ will be shortchanged again. ECF 1-3 at 24 (second benefit installment paid in March).

4

## LEGAL STANDARD

Plaintiffs are suffering "irreparable harm in the form of an ongoing loss of First Amendment freedoms." *In re A.H.*, 999 F.3d at 103 (quotation omitted). A preliminary injunction is necessary because they can "demonstrate[ ] a substantial likelihood of success on the merits of their claim that the school districts violated their rights to the free exercise of religion." *Id.* "The balance of the equities and the public interest favor[ ] securing [Plaintiffs'] First Amendment rights." *Id.* (quotations omitted).

## ARGUMENT

The U.S. Constitution "condemns discrimination against religious schools and the families whose children attend them." *Espinoza*, 140 S. Ct. at 2262. But religious discrimination in Vermont's Town Tuition Program inflicts irreparable harm on Plaintiffs and other families. It violates the Williamses' First Amendment rights and costs them educational opportunities that they can never get back. And it harms MSJ because families forego sending their children to avoid paying tuition out-of-pocket. MSJ is losing educational opportunities and is at a competitive disadvantage because Defendants' fail to provide equal benefits. Absent an injunction, discrimination against families and their schools will continue.

I.  **Defendants' Unconstitutional Denials Irreparably Harm Plaintiffs.**

Irreparable harm means "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages. *New York ex rel. Schneiderman*, 787 F.3d 638, 660 (2d Cir. 2015) (cleaned up). Irreparable harm is "often presumed where a constitutional injury is at stake." *Nolen v. City of Barre, Vt.*, No. 2:10-cv-241, 2011 WL 805865, at *7 (D. Vt. Mar. 1, 2011). "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *A.H. by & through Hester v. French*, 511 F. Supp. 3d 482, 497 (D. Vt. 2021) (quotation omitted). The "denial of [a] plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately

5

compensated monetarily." *Id.* (quotation omitted). Lost educational opportunities because of an unconstitutional deprivation are also an irreparable harm. *See A.H. by & through Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021).

Here, Plaintiffs' "ability to establish irreparable harm turns on whether they can demonstrate that Defendants have impaired their Free Exercise rights by denying tuition reimbursement payments." *A.H. by & through Hester v. French*, 511 F. Supp. 3d at 497. "[B]ecause the violation of a constitutional right is the irreparable harm asserted here, the two prongs of the preliminary injunction threshold merge into one: in order to show irreparable injury, plaintiff must show a likelihood of success on the merits." *Id.* (quotation omitted). Right now, Defendants' discrimination injures Plaintiffs—burdening their religious exercise and causing them to lose unrecoverable opportunities. Williams Decl. ¶ 43 (Williamses lose educational opportunities); Alexander Decl. ¶¶ 17-19, 30, 45 (schools lose families, educational opportunities, and divert funds from other programs amid denials).

## II. Plaintiffs' Free Exercise Claims Will Likely Succeed on the Merits.

Defendants violate Plaintiffs' free exercise rights in three main ways. First, Defendants denied the Williamses' 2020-21 tuition request solely based on MSJ's religious status. Second, Defendants refuse to fully honor 2021-22 tuition requests. Third, Defendants apply the unconstitutional adequate safeguards requirement to exclude Plaintiffs from full program participation because they are religious and incorporate religious views into their curriculum.

### A. Religious Status Denials Offend the First Amendment.

In *Espinoza*, the Supreme Court made clear that excluding families from generally available scholarship programs just because their schools are religious is unconstitutional—even if the goal was to prevent the religious uses of scholarships. 140 S. Ct. at 2246. This rule applies to Vermont's programs, too. *See A.H. ex rel.*

*Hester v. French*, 985 F.3d at 183 (applying *Espinoza* to Vermont's Dual Enrollment Program); *see also In re A.H.*, 999 F.3d at 107 n.7 ("*Espinoza* applies to all states.").

Just the like school districts in *In re A.H.*, here the School Defendants ignored *Espinoza*, followed direction from Defendant French, and denied the Williamses' tuition requests just because their high school is religious. ECF 1-3 at 7. Their ongoing, full denial of the tuition requests contradicts the Free Exercise Clause's commands. *Id.* (denying July 2020 request); *Id.* at 27–28 (refusing to honor renewed request). They are therefore entitled to injunctive relief. *In re A.H.*, 999 F.3d at 107.

### B. Defendants Refuse to Fully Honor MSJ Tuition Requests.

Defendants also violate Plaintiffs' rights by refusing to fully honor MSJ tuition requests while honoring those for secular schools. The Free Exercise Clause establishes a "minimum requirement of neutrality to religion." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (citation omitted). Government officials can fail to meet this requirement by targeting or demonstrating hostility toward religious adherents or their beliefs or activities.

In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, the Supreme Court explained the Free Exercise Clause protects against discrimination even when laws are ostensibly religion-neutral (which cannot be met here). 508 U.S. 520, 535–36 (1993)). It "extends beyond facial discrimination" and even "forbids subtle departures from neutrality" to "protect[ ] against governmental hostility which is masked, as well as overt." *Id.* at 534. This "Court must survey meticulously the circumstances of governmental categories to eliminate [ ] religious gerrymanders." *Id.*

The Supreme Court has further explained that "the Constitution 'commits government itself to religious tolerance,'" and courts must protect religious individuals and institutions when there is "even slight suspicion that proposals for

state intervention stem from animosity to religion or distrust of its practices." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (quoting *Lukumi*, 508 U.S. at 547). In *Masterpiece*, the Supreme Court recognized that either the enforcement history of a law or inconsistent enforcement can show unconstitutional hostility toward religion. 138 S. Ct. at 1729. That's because government officials who act in a manner hostile to religion violate their "solemn responsibility of fair and neutral enforcement." *Id.*

Here, Defendants' changed tuition payment procedures specifically target MSJ and other religious schools. Although State statute requires the district to pay the invoiced amount for resident children, *see* 16 V.S.A. § 824, Defendants adopted a policy reducing benefits to account for scholarships or other financial aid. ECF 1-3 at 11–12, 24. This only happened after multiple court decisions opened the tuition program to MSJ students. Defendants' previous tuition payment policy, still posted on its website, included no such reductions, even though they have been paying tuition to private schools for decades.[1] And recently obtained records show that since 2010, Defendants **never** requested scholarship information from participating schools or their students. *See* Ex. F (scholarship requests only after MSJ is eligible).

It's not as if MSJ's expensive, secular private competitors do not offer scholarships. They do. *See* Ex. G at 117, 120–21, 124. And some charge different tuition rates for students from sending towns, just as MSJ has done here. *Id.* at 117. But Defendants have never asked those schools for scholarship information until MSJ became eligible for the program. Ex. F. They just paid.

Worse still, Defendants' budget for the upcoming school year shows that they only intend to enforce this against MSJ, not secular private schools:[2]

---

[1] A copy of the policy, which limits tuition payments to "non-sectarian" schools, is at https://bit.ly/34fnCvm.
[2] *See also* Ex. G, which includes the School Defendants' proposed budget and secular private schools assessing different tuition rates for Town Tuition Program students.

**FY23 Proposed High School Tuition**

*Updated January 2022 for Mill River rate & added 2 Additional Otter Valley UHS Students*

| School | FY23 Projected | FY22 Budget | FY23 Rate Projected | FY23 Projected Budget |
|---|---|---|---|---|
| **Vermont Public Schools** | | | | |
| Mill River UHS | 2 | 2 | $ 17,625 | $ 35,250 |
| Otter Valley UHS | 6 | 4 | $ 16,900 | $ 101,400 |
| Rutland High School | 67 | 69 | $ 17,535 | $ 1,174,845 |
| Quarry Valley | 5 | 4 | $ 17,500 | $ 87,500 |
| Woodstock UHS | 1 | 0 | $ 19,425 | $ 19,425 |
| Subtotal | 81 | 79 | | $ 1,418,420 |
| **In State Private Schools** | | | | |
| Burr & Burton Academy | 2 | 1 | $ 17,685 | $ 35,370 |
| Killington Mtn School | 7 | 4 | $ 17,685 | $ 123,795 |
| Long Trail School | 3 | 2 | $ 17,685 | $ 53,055 |
| Mount St. Joseph Academy | 6 | 0 | $ 7,200 | $ 43,200 |
| St. Johnsbury Academy | 0 | 1 | $ 19,150 | $ - |
| VT Academy | 0 | 1 | $ 17,685 | $ - |
| Subtotal | 18 | 9 | | $ 255,420 |
| **Out of State Prinvate Schools** | | | | |
| Miss Hall's School | 1 | 0 | $ 17,685 | $ 17,685 |
| Subtotal | 1 | 0 | | $ 17,685 |
| **Total/Average HS Tuition** | 100 | 88 | $ 16,915 | $ 1,691,525 |

And Defendants' continued denial of tuition benefits to religious schools even in the face of multiple Supreme Court, Second Circuit, and District Court opinions demonstrates their hostility. They even moved to eliminate school choice for private schools altogether after the Second Circuit's ruling. ECF 1-4 at 36 (privately discussing "equity" proposal). This came after the Board met to discuss "Religious School Tuition." *Id.* at 31 (meeting minutes). They only abandoned this plan after public backlash. *See* ECF 1-5. *See also id.* at 41, 45, 47, 50 (noting policy targets MSJ). What's more, Defendants still threaten to demand reimbursement for tuition funds if the adequate safeguards are upheld. ECF 1-3 at 24.

### C. The "Adequate Safeguards" Requirement is Unconstitutional.

Defendants enforce the "adequate safeguards" requirement by threats to claw back families' benefits. But the requirement is facially unconstitutional, as are the enforcement methods the State has promulgated (ECF 1-1 at 1–3) and Defendants have adopted (ECF 1-3 at 11). It violates Plaintiffs' free exercise rights for four reasons. First, it puts Plaintiffs to a choice between their faith and a public benefit. Second, it discriminates based on a school's religious status and use. Third, it is not neutral, but targets religious exercise. And fourth, it is not generally applicable.

9

### 1. "Adequate safeguards" force an unconstitutional choice.

"[T]he liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017) (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)). That's because "the Free Exercise Clause protects against 'indirect coercion or penalties on [free exercise], not just outright prohibitions.'" *Id.* (citation omitted). The Williamses and other MSJ families are entitled to "an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Espinoza*, 140 S. Ct. at 2255 (citation omitted). Defendants cannot enforce the "adequate safeguards" requirement because "the provision puts families to a choice between sending their children to a religious school or receiving such benefits." *Id.* at 2257.

But the adequate safeguards requirement does just that. Here, the Williamses and MSJ are denied equal participation in the program because MSJ is a religious school that teaches subjects from a Catholic perspective. ECF 1-3 at 11. For that reason alone, Defendants treat the Williamses' MSJ tuition request differently. And for that reason alone MSJ families may only now participate in part and may have to repay their benefit. ECF 1-3 at 24.

### 2. Adequate safeguards only discriminate against religion.

In *Espinoza*, government officials sought to justify their discriminatory denials with an interest in preventing the "religious use" of benefits. 140 S. Ct. at 2256. But the Court rejected that argument because "[s]tatus-based discrimination remains status based even if one of its goals or effects is preventing religious organizations from putting aid to religious uses." *Id.* Here it's the same.

The adequate safeguards requirement only applies to religious schools because it only restricts religious schools' activities: faith-based education. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) (religious education and formation "is the very reason for the existence of most private religious schools.").

The requirement is a *de facto* status-based discrimination that excludes only religious schools. *See A.H. by & through Hester v. French*, 985 F.3d 165, 180–81 (2d Cir. 2021) (quoting *Lukumi*, 508 U.S. at 535–36) ("Because 'the effect of [the] law in its real operation' burdens only religious school students in Sending Districts and no others, we cannot conclude that the [safeguards are] religion-neutral.").

For that reason, there's no distinction between religious status discrimination or religious use discrimination. *Espinoza*, 140 S. Ct. at 2275-76 (Gorsuch, J. concurring). When a state conditions eligibility for public benefits "on the degree of religiosity of the institution and the extent to which that religiosity affects its operations," it discriminates on the basis of religious status. *In re A.H.*, 999 F.3d at 107–109 (Menashi, J. concurring quoting *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008)). And the illusion of "religious use" restrictions is only underscored when, as here, the government believes it is "impossible" to establish "safeguards." ECF 1-3 at 11 (explaining religious nature of MSJ's curriculum).

### 3. Enforcing adequate safeguards targets religious exercise.

The adequate safeguards requirement violates the Free Exercise Clause because it singles out religious schools and their students for worse treatment. In *Lukumi*, the Supreme Court explained "if the object of a law is to <u>infringe upon or restrict practices because of their religious motivation</u>, the law is not neutral" and therefore "it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." 508 U.S. at 533 (emphasis added).

The adequate safeguards requirement is not neutral. It only exists to "prevent the use of public money to fund religious education." *Chittenden*, 738 A.2d at 562. It is thus subject to strict scrutiny. Defendant French's policy, adopted by the School Defendants, requires religious schools like MSJ to try to decipher how much religion is in their program, so Defendants can proportionately reduce the families' benefit.

11

*See* ECF 1-3 at 11 (letter explaining safeguards); ECF 1-1 at 1–3 (French's policy).

Moreover, trying to apply the status-use distinction would violate the Establishment Clause. The status-use distinction would allow the State to favor some religions over others based on how they manifest their beliefs in the school context *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947) (religious favoritism prohibited). And it would excessively entangle the State with religion. *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979) (government review process prohibited).

### 4. The program and its safeguards are not generally applicable.

When laws that are not generally applicable burden religious exercise, they are subject to strict scrutiny. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). Recently in *Fulton*, the Supreme Court held that Philadelphia violated Catholic Social Services' Free Exercise rights when it refused to provide the adoption agency with an exemption from the City's nondiscrimination provision, especially where the law provided a formal mechanism for individualized exemptions. 141 S. Ct. at 1874.

"A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Id.* at 1877 (cleaned up). This occurs where government officials make "ad hoc discretionary decisions" on eligibility determinations based on individualized assessments. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004); *Lukumi*, 508 U.S. at 537. *See also Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990) (programs requiring "individualized governmental assessment of the reasons for the relevant conduct" are not generally applicable).

The program is not generally applicable—it allows school districts to choose which schools they will fund, and how much. 16 V.S.A. § 822. The Statute's language includes a formal system of exceptions: it even allows non-sending school districts to

tuition students if it is in their best interest. 16 V.S.A. § 822(c)(1). Assessing a child's best interest necessarily requires an individualized assessment. And the safeguards requirement is itself an individualized assessment as it requires Defendants to single out religious schools' religious conduct for disqualification of benefits. *See* ECF 1-3 at 11 (District's letter explains it is "nearly impossible" to determine safeguards based on Defendants trolling MSJ's website); *id.* at 24 (district relying on adequate safeguards to threaten tuition claw back due to religion).

### D. Defendants' Discrimination Fails Strict Scrutiny.

Because Defendants violated Plaintiffs' free exercise rights, their denials must satisfy strict scrutiny. *See Espinoza*, 140 S. Ct. at 2255 (quoting *Trinity Lutheran*, 137 S. Ct. at 2021) ("[D]isqualifying otherwise eligible recipients from a public benefit 'solely because of their religious character' imposes 'a penalty on the free exercise of religion that triggers the most exacting scrutiny.'"). Only a "state interest of the highest order" can justify Defendants' discriminatory policy. *Trinity Lutheran*, 137 S. Ct. at 2024 (cleaned up). Defendants cannot meet this burden because they do not have a compelling interest in restricting the Williamses' and MSJ's program access. And they have not pursued their goals in the least restrictive means.

Vermont's interest in enforcing its Compelled Support Clause cannot justify infringing on federal constitutional rights. "[A] state cannot justify discrimination against religious schools and students by invoking an 'interest in separating church and State more fiercely than the Federal Constitution.'" *In re. A.H.*, 999 F.3d at 100 (quoting *Espinoza*, 140 S. Ct. at 2256, 2260). That's because "'the state interest asserted here . . . is limited by the Free Exercise Clause.'" *Trinity Lutheran*, 137 S. Ct. at 2024 (quoting *Widmar v. Vincent*, 454 U.S. 263, 276 (1981)). Vermont does not have "a greater interest in refusing to fund religious education than Montana does." *In re A.H.*, 999 F.3d at 107 n.7. "The Supreme Court's decision in *Espinoza* applies to

all states" and Vermont has no historical interest in excluding religious schools *Id*.

And Defendants cannot articulate a "broadly formulated" compelling interest to deny the Williamses' their full benefit. *Fulton*, 141 S. Ct. at 1881. Courts "must 'scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants.'" *Id*. quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006). Here, Defendants have no interest in denying the Williams family the ability to use their benefit to send their children to MSJ.

### III. The Balance of Hardships Strongly Favors Plaintiffs.

"[L]ost precious constitutional rights" are a significant harm that warrants courts' intervention. *In re A.H.*, 999 F.3d at 106. Families that choose religious schools "are members of the community too," and are entitled to "an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Espinoza*, 140 S. Ct. at 2255, 2262 (cleaned up). Here there's no doubt that the Williamses' and MSJ's constitutional rights are lost. *See, e.g.*, *A.H. by & through Hester v. French*, 511 F. Supp. 3d at 501 (free exercise rights lost from unconstitutional program denial).

By itself, the ongoing violation of First Amendment rights warrants injunctive relief, but Plaintiffs also lose out on irreplaceable opportunities. Defendants are about to disburse program benefits and without an injunction Plaintiffs will suffer another round of discrimination, which has real-world consequences. ECF 1-3 at 24. The Williamses cannot provide their children with more college help, which forever limits their children's educational opportunities. Williams Decl. ¶ 40–43.

And MSJ and other religious schools face an extreme competitive disadvantage with secular private schools because their families do not receive equal benefits. Alexander Decl. ¶ 55. While secular private schools advertise their tuition program participation, Defendants' are threatening MSJ families with claw backs of program benefits. Ex. G at 117, 120, 123; ECF 1-3 at 24. This discourages families from

14

choosing religious schools. Alexander Decl. ¶ 45. And MSJ's mission and other programs will suffer because it must subsidize their students' education to compete. *Id.* at ¶ 30.

Yet Defendants suffer nothing from following the Free Exercise Clause's commands. They have no legitimate interest in a discriminatory tuition regime. Defendants have a legal obligation to provide a publicly funded education to their students. 16 V.S.A. §§ 822, 824. And an injunction will not impose any administrative burden on Defendants because they can just treat the Williamses and MSJ the same as other families and secular private schools.

## IV. The Public Interest Supports Enjoining Defendants' Discrimination.

Given Defendants' discrimination and Plaintiffs' circumscribed rights, an injunction supports the public interest. "[S]ecuring First Amendment rights is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *see also A.H. by & through Hester v. French*, 511 F. Supp. 3d at 497. But enforcing "an unconstitutional law" always clashes with "the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). *See also Soos v. Cuomo*, 470 F.Supp.3d 268, 284 (N.D.N.Y. 2020) (equal treatment of similarly situated entities serves public interest and "preserves bedrock free-exercise guarantees.")

## CONCLUSION

Defendants are excluding Plaintiffs from a neutral public benefit. This Court should enjoin Defendants from barring Plaintiffs' equal access to the program and order immediate and full benefits.

Respectfully submitted this 7th day of March, 2022.

*/s/ Thomas E. McCormick*

| | |
|---|---|
| Thomas E. McCormick | Ryan J. Tucker* |
| (VT Bar No. 837) | (AZ Bar No. 034382) |
| McCormick, Fitzpatrick, Kasper & Burchard, P.C. | Alliance Defending Freedom |
| 40 George Street | 15100 N. 90th Street |
| Burlington, VT 05402 | Scottsdale, AZ 85260 |
| Telephone: (802) 863-3494 | Telephone: (480) 444-0020 |
| Fax: (802) 865-9747 | Fax: (480) 444-0028 |
| Email: tem@mc-fitz.com | Email: RTucker@ADFlegal.org |
| | |
| Paul Daniel Schmitt** | David A. Cortman |
| (IN Bar No. 34765-49) | (GA Bar No. 188810) |
| Alliance Defending Freedom | Alliance Defending Freedom |
| 440 First Street NW, Suite 600 | 1000 Hurricane Shoals Road NE Suite D-1100 |
| Washington, D.C. 20001 | Lawrenceville, GA 30043 |
| Telephone: (202) 393-8690 | Telephone: (770) 339-0774 |
| Fax: (202) 393-3622 | Fax: (700) 339-6744 |
| Email: PSchmitt@ADFlegal.org | Email: DCortman@ADFlegal.org |

*\*Pro Hac Vice application forthcoming*
*\*\* Application for admission pending*

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of March, 2022, I electronically filed the foregoing document with the Clerk of Court using the ECF system. The foregoing document will be served via private process server with the Summons and Complaint to all defendants.

Dated this 7th day of March, 2022, by:

                          */s/ Thomas E. McCormick*
                          Thomas E. McCormick (VT Bar No. 837)
                          MCCORMICK, FITZPATRICK, KASPER & BURCHARD, P.C.
                          40 George Street
                          Burlington, VT 05402
                          Telephone: (802) 863-3494
                          Fax: (802) 865-9747
                          Email: tem@mc-fitz.com

                          *Counsel for Plaintiffs*