UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| E.W., by and through her parents and natural Guardians; J.W., by and through his parents and natural guardians; JOSEPH WILLIAMS, individually; HEATHER WILLIAMS, individually; and the ROMAN CATHOLIC DIOCESE OF BURLINGTON, VERMONT, *Plaintiffs*, | ) ) ) ) ) ) ) ) ) | |
| v. | ) ) | Civil No. 2:22-cv-59 |
| DANIEL FRENCH, in his official capacity as Secretary of the Vermont Agency of Education; JEANNÉ COLLINS, in her official capacity as Superintendent of the Rutland Northeast Supervisory Union; and the BARSTOW UNIFIED BOARD OF SCHOOL DIRECTORS, *Defendants*. | ) ) ) ) ) ) ) ) | |

## COMBINED MOTION TO DISMISS ALL CLAIMS AGAINST SECRETARY FRENCH AND OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Defendant Daniel French, sued solely in his official capacity as Secretary of the Vermont Agency of Education (AOE), moves by and through his attorney, the Vermont Attorney General's Office, to dismiss all claims against him pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). He further opposes Plaintiffs' Motion for a Preliminary Injunction. In support, he submits the following incorporated Memorandum of Law.[1]

---

[1] Pursuant to this Court's Order of March 24, 2022, ECF No. 22, Secretary French hereby submits a combined memorandum of law of less than 40 pages in length moving to dismiss Plaintiffs' claims and opposing Plaintiffs' motion for a preliminary injunction.

## MEMORANDUM OF LAW

Plaintiffs E.W. and J.W. are students who live in a "sending district" that tuitions students instead of operating a high school. They, along with their parents and the Roman Catholic Diocese, allege that their school district improperly limited its payment of tuition to Mount Saint Joseph Academy (MSJ), a school operated by the Diocese, because it is religious. *See* Complaint (hereinafter Cplt.) ¶ 208. Plaintiffs allege this violated the First Amendment's Free Exercise, Establishment, and Free Speech clauses and due process. *Id*. ¶¶ 219-97. They bring suit against their school board, superintendent, and Secretary French in his official capacity.

Plaintiffs contend Secretary French is liable for the asserted violations of their constitutional rights based on allegations that in 2020 an AOE employee said tuition could not be paid to a religious school and in 2021 Secretary French promulgated non-binding guidance on the topic. Cplt. ¶¶ 65-67, 69-74, 174-78. Specifically, that guidance explained how, in AOE's view, districts could balance their obligations under the U.S. Constitution's Free Exercise Clause and the Vermont Constitution's Compelled Support Clause by asking independent schools to certify that they would not use public tuition dollars for religious worship or instruction. *See* Ex. 1 to Cplt. at 3-4. As Plaintiffs point out, Secretary French rescinded that guidance in February 2021 after the Second Circuit issued its decision in *A.H. v. French*. Cplt. ¶ 73.

Because the guidance Plaintiffs challenge was rescinded, they cannot show any relief against Secretary French would provide redress, and their claims fail for lack of standing. Moreover, because Plaintiffs cannot show Secretary French is engaged in any ongoing violation of federal law, sovereign immunity bars their claims. Finally, even if this Court were to reach them, Plaintiffs' claims fail on the merits and must be dismissed. Moreover, because Plaintiffs' claims

fail, and because they cannot show that an injunction against rescinded guidance would afford them any relief, Plaintiffs' preliminary-injunction motion must be denied.

## BACKGROUND

Vermont school districts may satisfy their obligation to educate their high-school students by maintaining a school or tuitioning their students to other schools. 16 V.S.A. §§ 822(a)(1), 828. If a district tuitions instead of operating a school, its students attend schools "selected by the[ir] parents or guardians" from among the eligible options. *Id*. § 822(a)(1). Eligible options include public schools and approved independent schools. *Id*. § 828. MSJ, a high school operated by Plaintiff Roman Catholic Diocese, is an approved independent school. Cplt. ¶¶ 2, 138.

A district's school board decides in the first instance if the parents' chosen school is eligible for tuition payment. 16 V.S.A. § 828; *see also Campbell v. Manchester Bd. of Sch. Dirs.*, 161 Vt. 441, 447, 641 A.2d 352, 356 (1994) (noting, in case holding payment of tuition to religious school did not violate Establishment Clause, "the districts must determine whether such a payment violates the Establishment Clause. This responsibility rests upon them, and not the State Board, except as a matter of appellate review."). The school board's decision can be appealed to the State Board of Education. 16 V.S.A. § 828.

Vermont school districts may pay tuition to religiously affiliated approved independent schools. The statutes governing tuition payment are religion-neutral. *See id*. §§ 166, 822, 828; *Chittenden Town Sch. Dist. v. Dep't of Educ.*, 169 Vt. 310, 317, 738 A.2d 539, 545 (1999) (noting the "relevant statutes allow school districts to pay tuition on behalf of a resident who is a student in any approved private school" without regard to religion (quotation omitted)).

Under the Compelled Support Clause of the Vermont Constitution, districts must ensure that public tuition money does not fund worship. Vt. Const. ch. I, art. 3. The Vermont Supreme Court

3

has held that "a school district violates Chapter I, Article 3 when it reimburses tuition for a sectarian school under § 822 in the absence of adequate safeguards against the use of such funds for religious worship," which it construed to include religious instruction. *Chittenden*, 169 Vt. at 312, 738 A.2d at 541-42. As the Vermont Supreme Court more recently reiterated, *Chittenden* did not hold "more generally that children who attend religious schools may not receive public educational funding." *Taylor v. Town of Cabot*, 2017 VT 92, ¶ 23, 205 Vt. 586, 178 A.3d 313. Rather, *Chittenden*'s "most critical lesson . . . is that the fact that the recipient of government support is a religious organization is not itself determinative under the Compelled Support Clause; whether the funds are used to support religious worship is the critical question." *Id*.

As this Court has already found, Secretary French "does not control the determinations made by local school districts regarding whether to fund an independent high school that is 'approved' by the State Board of Education pursuant to 16 V.S.A. § 166(b)." *A.M. v. French*, No. 2:19-CV-15, 2020 WL 2786446, at *4 (D. Vt. May 29, 2020). Secretary French has no statutory authority to decide whether a district will tuition a student to a particular school, or under what circumstances. *See* 16 V.S.A. § 828. No Vermont statute empowers him, AOE, or any part of Vermont's executive branch to intervene in the districts' statutory role to decide these matters in the first instance. *See generally id*. ch. 21, Maintenance of Public Schools.

Plaintiffs allege the following regarding Secretary French and AOE. In 2020, after the U.S. Supreme Court's decision in *Espinoza v. Montana Department of Revenue*, AOE "informed local school districts that *Espinoza* did not apply to Vermont" and "tuition could not be paid to religious or parochial schools." Cplt. ¶¶ 65-67, 174-78. In January 2021, AOE published guidance explaining what, in its view, would constitute "adequate safeguards" under *Chittenden*. Cplt. ¶¶ 69-71. That guidance is attached to the Complaint. Ex. 1 to Cplt. at 2-4. AOE then

4

rescinded that guidance in February 2021 after the Second Circuit issued its order in *A.H.* Cplt. ¶ 73. The notice of rescission is also attached to the Complaint. Ex. 2 to Cplt. at 1.

## ARGUMENT

### I.      Motion to Dismiss Standard

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. . . . Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

To survive a Rule 12(b)(1) motion to dismiss, a complaint must "allege[] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (quotation omitted). Plaintiffs bear the burden of proving subject-matter jurisdiction, and "that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quotation omitted), *aff'd*, 561 U.S. 247 (2010). The court "need not 'credit a complaint's conclusory statements without reference to its factual context,'" and "where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146-47 (2d Cir. 2011) (citing *Iqbal*, 556 U.S. at 686).

## II.   Plaintiffs lack standing.

### a.   Plaintiffs cannot establish redressability.

The party invoking jurisdiction "bears the burden of establishing" the "triad of injury in fact, causation, and redressability" that "constitutes the core of Article III's case-or-controversy requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998). Claims fail the redressability prong where they "promise no concrete benefit to the plaintiff." *Id.* at 103 n.5.

Plaintiffs cannot establish redressability as to Secretary French because their requested injunctive and declaratory relief against him would provide them no concrete benefit. They do not and cannot plausibly allege that the remark of an AOE employee in 2020 that tuition could not be paid to religious schools represents current AOE policy, much less that it is influencing their school district, which is paying tuition on their behalf to a religious school. *See* Cplt. ¶¶ 65-67, 201. And Plaintiffs acknowledge that AOE rescinded the subsequent non-binding adequate-safeguards guidance they challenge. Cplt. ¶¶ 73-74. They attached the notice of rescission to their Complaint, Ex. 2 to Cplt. at 2, so the notice is deemed incorporated into it. *Chambers v. Time Warner, Inc*., 282 F.3d 147, 152 (2d Cir. 2002). It stated: "The Agency has rescinded that document in light of ongoing litigation. The Agency reserves the right to formulate best practices or guidance around these issues when the litigation is resolved." *Id*. Plaintiffs misleadingly claim that AOE "explained that they would re-issue guidance after the ongoing litigation concluded." Cplt. ¶ 73. But because this "conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Grp.*, 671 F.3d at 146-47. AOE simply rescinded the guidance and stated it was reserving the right to formulate best practices in the future once the litigation was

resolved. AOE does not have—and Plaintiffs do not allege it has—current or forthcoming policy or guidance on the topic. *See generally* Cplt.

Because AOE has no current or planned guidance or policy on payment of tuition to religious schools, Plaintiffs' requested declaratory and injunctive relief would have no effect as to Secretary French and would provide Plaintiffs no concrete benefit. To the extent Plaintiffs want a declaration of the law regardless, that would be a mere advisory opinion. "Any persuasive effect a judicial order" against Secretary French might have on school districts "cannot suffice to establish redressability." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254–55 (11th Cir. 2020). "Redressability requires that the court be able to afford relief through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion explaining the exercise of its power." *Id*. (quotation omitted). Since Plaintiffs' requested relief against Secretary French would have no real-world impact, and a "generalized interest in deterrence . . . is insufficient for purposes of Article III," their claims fail for lack of redressability. *Steel Co.*, 523 U.S. at 108-09. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Id*. at 107. And "[f]or a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." *Id*. at 101–02.

### b.  The Diocese lacks standing to raise the rights of third parties.

The Diocese's third-party claims "on behalf of families who both are eligible to receive town tuition benefits and who wish to attend Mt. Saint Joseph" must be dismissed. Cplt. ¶ 29. As this Court has already held, "the Diocese of Burlington lacks standing to assert the claims of third parties not before the court" because there is no hindrance to such parties asserting their own rights. *A.H. v. French*, No. 2:20-CV-151, 2021 WL 3619688, at *11 (D. Vt. Aug. 16, 2021) (citing *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004)).

### III.   Secretary French is entitled to sovereign immunity because the *Ex parte Young* exception does not apply.

Suits against state officials in their official capacity are generally barred because "[a]n action against a state official in his official capacity is deemed an action against the state itself, which possesses sovereign immunity under the Eleventh Amendment." *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 122 (2d Cir. 2020) (citations omitted). Sovereign immunity is a jurisdictional bar. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). There is a limited exception, enunciated in *Ex parte Young*, 209 U.S. 123 (1908), that permits suits for prospective injunctive relief against state officials engaged in ongoing violations of federal law. The "exception is narrow: It applies only to prospective relief [and] does not permit judgments against state officers declaring that they violated federal law in the past." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc*., 506 U.S. 139, 146 (1993) (citation omitted).[2] "The line between prospective and retrospective relief is drawn because [r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law, whereas compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." *Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir. 2000) (quotation omitted). It is Plaintiffs' burden to show *Ex parte Young* applies. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

*Ex parte Young* does not apply because Plaintiffs do not plausibly allege Secretary French is engaged in any ongoing violation of federal law. Their factual allegations against him—that an AOE employee said in 2020 that tuition could not be paid to religious schools, and then in 2021 AOE issued and then rescinded guidance explaining how tuition could be paid to religious

---

[2] Therefore, to the extent Plaintiffs are requesting money damages against Secretary French, sovereign immunity bars those claims. *See Libertarian Party of Erie Cty*., 970 F.3d at 123 (a "state official sued in his official capacity is entitled to invoke Eleventh Amendment immunity from a claim for damages").

schools subject to safeguards—are retrospective. *See* Cplt. ¶¶ 30-32, 65-74, 86, 95, 174-78.

Plaintiffs' most current factual allegations regard the guidance, which AOE rescinded over a year

ago. *Id*. ¶ 73; Ex. 2 to Cplt. Past acts cannot establish an ongoing violation. *De Figueroa v. New*

*York*, 403 F. Supp. 3d 133, 151–52 (E.D.N.Y. 2019) ("Where a plaintiff alleges only discrete

acts of past discrimination and retaliation, merely characterizing the request for relief as

prospective will not suffice to invoke the *Ex parte Young* doctrine" (quotation omitted)); *Knight*

*v. N.Y. State Dep't of Corrs*., No. 18-CV-7172 (KMK), 2020 WL 3893282, at *8, 9 n.7

(S.D.N.Y. July 10, 2020) (plaintiff failed to show *Ex parte Young* applied where "alleged

constitutional violations occurred in the past," as "past wrongs do not justify an application of *Ex*

*parte Young*" (quotation and alteration omitted)); *Falcon v. City Univ. of N.Y.*, No.

15CV3421ADSARL, 2016 WL 3920223, at *9 (E.D.N.Y. July 15, 2016) (alleged past "acts of

discrimination are not the kind of ongoing violations of federal law that . . . *Ex parte Young* was

intended to remedy"); *Pasternak v. Baines*, No. 00 Civ. 0369(JTC), 2006 WL 2570982, at *9

(W.D.N.Y. Sept. 5, 2006) (*Ex parte Young* not satisfied because "plaintiff has alleged no

ongoing violations of federal law, only discrete acts of past discrimination and retaliation").

Plaintiffs' conclusory allegations suggesting ongoing violations, such as "[t]he Agency of

Education and Defendant French violate Plaintiffs' First Amendment Free Exercise rights by

instructing local school districts to limit public funding to religious schools and their students

based on those schools' religious activities and speech," Cplt. ¶ 250, also do not establish *Ex*

*parte Young* applies. A "vague legal conclusion . . . that the State continues to violate" federal

law will be disregarded. *KM Enters., Inc. v. McDonald*, No. 11-CV-5098 ADS ETB, 2012 WL

4472010, at *9 (E.D.N.Y. Sept. 25, 2012), *aff'd*, 518 F. App'x 12 (2d Cir. 2013) (citing *Iqbal*,

129 S. Ct. at 1949). Plaintiffs cannot circumvent *Ex parte Young* by making vague conclusory allegations in the present tense that are unsupported by any factual detail.

Moreover, speculation that AOE might violate Plaintiffs' rights in the future would also be insufficient. *See Aho v. Anthony*, No. 3:09-CV-728 (CFD), 2009 WL 10711875, at *2 (D. Conn. Dec. 4, 2009) (where plaintiff claimed state troopers violated his rights by ejecting him from town meeting and might "be present at another meeting and prevent [him] from voting," claim was "too speculative to invoke the *Ex Parte Young* doctrine").

Next, to the extent Plaintiffs would argue that *Ex parte Young* applies because Secretary French has a general duty to enforce the law, "[a] state official's general duty to enforce state laws is insufficient to establish the requisite connection" for *Ex parte Young* to apply. *A.H.*, 2021 WL 3619688, at *12 (citing *Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. State*, 336 F. Supp. 3d 50, 69 (E.D.N.Y. 2018) (observing that "courts in the Second Circuit have not extended the exception under *Ex parte Young* on the basis that a state official has a general duty to execute and enforce state laws" (internal quotation marks and citations omitted)).

And finally, the fact that Plaintiffs style their claims as seeking declaratory and injunctive relief does not save them. *See Pappas v. Lorintz*, 832 F. App'x 8, 12 (2d Cir. 2020) (Eleventh Amendment bars claims focused on past alleged harms even though plaintiff styled them as seeking declaratory and injunctive relief); *KM Enters.*, 2012 WL 4472010, at *10 (*Ex parte Young* barred claims where plaintiff alleged no ongoing violation of law but sought official's "future compliance with governing law and regulations").

IV.     **Plaintiffs' claims fail on the merits.**

a.     **Plaintiffs' Free Exercise claims fail on the merits.**

Plaintiffs' Free Exercise claim challenges Secretary French's now-rescinded adequate-safeguards guidance.[3] Cplt. ¶¶ 232, 250-53. That non-binding guidance explained how, in AOE's view, school districts could balance their obligations under the federal Constitution's Free Exercise Clause and the Vermont Constitution's Compelled Support Clause. Plaintiffs' argument that this rescinded non-binding guidance is violating their rights fails because—even if it were not rescinded—that guidance, if implemented, would not have violated the Free Exercise Clause. First, the guidance would not trigger strict scrutiny, and would pass muster under the Free Exercise Clause, because it only suggested limiting the use of funds for religious worship and instruction; it did not suggest denying funding based on religious identity. Second, even if the guidance were subject to strict scrutiny, it would pass because it was narrowly tailored to further a compelling government interest in a founding-era Vermont constitutional provision.

i.     **The adequate-safeguards guidance would not trigger strict scrutiny.**

The adequate-safeguards guidance would not trigger strict scrutiny, and would not violate the Free Exercise Clause, because it did not suggest limiting the funding of any religious school because of its "religious status." *Espinoza v. Mt. Dep't of Revenue*, 140 S. Ct. 2246, 2257 (2020) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2023 (2017)). The guidance suggested only that districts ask independent schools to certify that they would not use public money for religious instruction and worship—which would limit only what the schools might "propose[] to do – use the [public] funds" to support the "essentially religious endeavor[s]" of instruction in religious doctrine. *Id.* (quoting *Trinity Lutheran*, 137 S. Ct. at

---

[3] Plaintiffs' only allegations against AOE phrased in the present tense, respecting allegedly ongoing harm—although vague and conclusory—stem from the guidance. Cplt. ¶¶ 232, 250-53.

2023-24 and *Locke v. Davey*, 540 U.S. 712, 721 (2004)). Such a use-based restriction would not violate the Free Exercise Clause because it would not be a constitutionally suspect penalty on religious activity, or targeting of religious conduct, but would "merely reflect[] . . . refusal to subsidize religious exercise.'" *Carson v. Makin*, 979 F.3d 21, 25 (1st Cir. 2020).

### ii. Even if it did trigger strict scrutiny, the guidance would pass it.

Even if the adequate-safeguards guidance did trigger strict scrutiny, it would pass because it is narrowly tailored to further a compelling government interest. To satisfy strict scrutiny, "government action must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Espinoza*, 140 S. Ct. at 2260. Vermont has an interest of the highest order, dating back to the founding era, in protecting Vermonters' freedom of conscience and ensuring Vermonters are not forced to support religions they do not believe in and which may be at odds with their own religious beliefs. This interest is analogous to the founding-era interest upheld in *Locke* in preventing public money from supporting religious instruction. The adequate-safeguards guidance could not have been more narrowly tailored to achieving that interest.

### iii. The guidance would further an interest of the highest order.

Vermont's compelling interest arises out of its constitution's Compelled Support Clause, which provides "that no man ought, or of right can be compelled, to attend any religious worship, or erect, or support any place of worship, or maintain any minister, contrary to the dictates of his conscience." Vt. Const., ch. I, art. 3. The Compelled Support Clause dates back to the State's original 1777 constitution. It predates the U.S. Constitution.

Vermont's Constitution, including the Compelled Support Clause, reflects a fervent dedication to religious liberty. It also reflects a recognition that freedom of conscience—freedom to engage in and support religious worship as dictated by one's own mind, not by the

government—is a necessary aspect of religious liberty. In the same breath, it provides "[t]hat all persons have a natural and unalienable right, to worship Almighty God, according to the dictates of their own consciences and understandings, . . . and that no person . . . can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any minister." Vt. Const., ch. I, art. 3. The injunction against compelled support is connected to the declaration of the right to worship not with "but," but with "and." Freedom from compelled support for the religion of others is an inextricable part of Vermonters' religious freedom.

Vermont's Compelled Support Clause closely resembles the 1786 Virginia Statute for Religious Liberty first drafted by Thomas Jefferson and spearheaded by James Madison. That Statute provides "[t]hat no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever." Va. Code Ann. § 57-1 (1786); *see also Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 11-13 (1947) (describing history of statute).

Like the Virginia Statute for Religious Liberty, Vermont's Compelled Support Clause was born out of reverence for religious conviction. The preamble to the Virginia Statute, which enacted in response to a bill that would have required Virginians to pay taxes to support religious teachers, famously proclaimed that "Almighty God hath created the mind free; that all attempts to influence it by temporal punishments, or burthens, or by civil incapacitations, tend only to beget habits of hypocrisy and meanness." *Everson*, 330 U.S. at 12-13 (quotation omitted). It went on: "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical; that even the forcing him to support this or that teacher of his own religious persuasion, is depriving him of the comfortable liberty of giving his contributions to the particular pastor, whose morals he would make his pattern." *Id*.

13

Similarly, after the Vermont Legislature passed a 1783 act permitting towns to levy a tax to hire and support a minister, the Council of Censors—which at the time reviewed the State's laws for constitutionality—declared the act "repugnant to the Constitution" of the State. Records of the Council of Censors, An Address of the Council of Censors to the People of Vermont, 158 (1800); *Chittenden*, 738 A.2d at 553-54 (describing Council of Censors and repeal of 1783 Ministerial Act); *see also Trinity Lutheran*, 137 S. Ct. at 2034 (Sotomayor, J., dissenting). Echoing Jefferson and Madison, the Council declared that "religion is a concern personally and exclusively operative between the individual and his God; and that whoever attempts to control this sacred right, in any possible way, does it by usurpation and not by right." Records at 157-58. The Council urged the act's repeal to "restore community to their inestimable constitutional privileges, and prevent the establishment of precedents dangerous to, and subversive of, the dearest rights of freemen." *Id*. at 158. It was accordingly repealed. *See Trinity Lutheran*, 137 S. Ct. at 2034 (Sotomayor, J., dissenting).

As the Records of the Council of Censors shows, to those who drafted the Vermont Constitution and first construed it, freedom from compelled support for the religion of others was not in opposition to the free exercise of religion. It *was* freedom of religion. And this belief was hardly limited to Vermont.[4] As the Supreme Court observed, to Jefferson and Madison, who framed not just the Virginia Statute for Religious Liberty but also the First Amendment, "'[e]stablishment' and 'free exercise' were correlative and coextensive ideas, representing only different facets of the single great and fundamental freedom" of religion. *Everson*, 330 U.S. at 40 (Rutledge, J., dissenting).

---

[4] Vermont's first constitution, including the Compelled Support Clause, was modeled on Pennsylvania's 1776 constitution. Matt Bushnell Jones, Vermont in the Making: 1750-1777, 385-92 (1939); *see also* Penn. Const., ch. 1, art. 2 (1776).

14

Consistent with its purpose of promoting freedom of conscience, Vermont's Compelled Support Clause is a narrow prohibition on compelled support for worship. It allows public funds to flow to religious institutions. They simply may not fund worship. *Taylor v. Town of Cabot*, 178 A.3d 313, 320 (Vt. 2017) ("[T]he fact that the recipient of government support is a religious organization is not itself determinative under the Compelled Support Clause; whether the funds are used to support religious worship is the critical question."). The Vermont Supreme Court has therefore upheld, under the Compelled Support Clause and First Amendment, a leasing agreement between a state agency and religious college to support construction of a classroom and science building for the college. *Mann*, 247 A.2d at 74. It likewise found taxpayers challenging the publicly funded restoration of an historic church very unlikely to succeed in arguing that such funding violated the Compelled Support Clause. *Taylor*, 178 A.3d at 320.

And in the context of tuition to religious schools, the Vermont Supreme Court has not disapproved "the myriad ways that a public school district can subsidize education in a religious school by paying for expenses that [would] occur whether or not the school was sectarian," like "payments for school transportation to sectarian schools, . . . text books used in sectarian schools, . . . or teachers of secular subjects to sectarian school children." *Chittenden*, 738 A.2d at 562. Instead, the Vermont Supreme Court has interpreted the Compelled Support Clause as simply requiring school districts to ensure that public funds are not used for religious worship. The Vermont Supreme Court therefore held in *Chittenden* that a school district paying tuition to a religious school would have to require adequate safeguards to ensure that public dollars flowing to religious schools did not support worship. 738 A.2d at 542.

Vermont's narrow constitutional proscription against forced contribution to religious worship, like the Establishment Clause that followed it and shares some of its historical and

intellectual lineage, is a critical protection for Vermonters' religious freedom. Vermont's

Compelled Support Clause and the federal Establishment Clause are textually distinct and resist

conflation. *See Chittenden*, 738 A.2d at 562 (holding Compelled Support Clause not "intended to

cover only state religious establishments").[5] But despite their different means and ends, both

provisions protect individual freedom of conscience against compulsion. *Cantwell v.*

*Connecticut*, 310 U.S. 296, 303 (1940) ("Freedom of conscience and freedom to adhere to such

religious organization or form of worship as the individual may choose cannot be restricted by

law."). Vermont's interest in protecting individuals' rights to engage in and support religious

worship as they see fit—and *only* as they see fit—is as old as the Republic, and as important as

any other right enshrined in the States' constitutions.

   That interest is as vital today as ever. It resonates, for instance, with the Supreme Court's

recognition in *Burwell v. Hobby Lobby Stores* that requiring employers to pay money for health-

insurance coverage that could be used for contraceptives violated the employers' sincerely held

religious beliefs. 573 U.S. 682, 724-25 (2014). As the Supreme Court explained, forcing a person

to financially support something they do not believe in implicates difficult questions of moral

and religious philosophy—and may violate individuals' sincerely held religious beliefs—even

when the causal link between the financial support and ultimate outcome is attenuated. *Id*. at 724.

   Vermont's interest in freedom from forced support for the worship of others is analogous to

the state interest upheld in *Locke*. *Locke* involved a Washington state constitutional provision

providing that "[n]o public money or property shall be appropriated for or applied to any

religious worship, exercise or instruction, or the support of any religious establishment," Wash.

---

[5] Thus, the intervention of "parental choice between the public funding source and the educational provider" may alleviate an "establishment" concern but not necessarily a "compelled support" concern. *Chittenden*, 738 A.2d at 563; *compare Mitchell v. Helms*, 530 U.S. 793, 829-36 (2000).

Const., art. I, § 11, which had "been authoritatively interpreted as prohibiting even indirectly funding religious instruction that will prepare students for the ministry." 540 U.S. at 719. *Locke* observed that Washington's interest was "scarcely novel" and there were "few areas in which a State's antiestablishment interests come more into play." *Id*. at 722. It noted that "[s]ince the founding of our country, there have been popular uprisings against procuring taxpayer funds to support church leaders, which was one of the hallmarks of an 'established' religion." *Id*. Therefore, it held—citing state constitutional provisions including Vermont's Compelled Support Clause—that "[m]ost States that sought to avoid an establishment of religion around the time of the founding placed in their constitutions formal prohibitions against using tax funds to support the ministry." *Id*. at 723. This interest in refraining from funding an "essentially religious endeavor," the Court held, was "historic and substantial" and thus Washington's restriction did not offend the Free Exercise Clause. *Id*. at 721, 725.

Vermont's interests reflected in its Compelled Support Clause parallel Washington's. Like Vermont, Washington's constitution foreclosed the State from funding "a distinct category of instruction"—religious training—but allowed public funding to flow to religious institutions and went "a long way toward including religion in its benefits." *Id*. at 721, 724. Washington, like Vermont, simply drew a line at forcing its citizens to pay for the propagation of others' religious beliefs. *Id*.; *see also Taylor*, 178 A.3d at 323.

Vermont's founding-era interest in protecting freedom of conscience is not comparable to the interest Montana asserted in *Espinoza* in its mid-nineteenth century mini-Blaine Amendment prohibiting aid to religious schools. *See* 140 S. Ct. at 2268 (Alito, J., concurring) (noting that Montana's no-aid "provision was modeled on the failed Blaine Amendment to the Constitution of the United States" which "was prompted by virulent prejudice against immigrants, particularly

17

Catholic immigrants"). *Espinoza* held "there is no 'historic and substantial' tradition against aiding [religious] schools." *Id*. at 2259. The Court noted that "[i]n the founding era and the early 19th century, governments provided financial support to private schools, including denominational ones." *Id*. at 2258. Montana argued that "a tradition against state support for religious schools arose in the second half of the 19th century, as more than 30 States—including Montana—adopted no-aid provisions."[6] *Id*. The Supreme Court held that these "no-aid provisions of the 19th century" born out of anti-Catholic, anti-immigrant bias "hardly evince a tradition that should inform our understanding of the Free Exercise Clause." *Id*. at 2259.

Those words from *Espinoza* echo the Vermont Supreme Court's 1999 holding in *Chittenden* that "the specific prohibitions on public financial support for religious schools and other religious institutions" so prevalent in other States' constitutions "were adopted between 1830 and 1928 in response to attempts to obtain funds for Roman Catholic institutions, particularly schools," and that such constitutional amendments—which Vermont did not adopt—"shed no light" on the Compelled Support Clause, "which was first adopted in 1777." 738 A.2d at 558.

Montana's ban on funding religious schools shares none of the history or intellectual roots of founding-era protections for religious conscience like Vermont's Compelled Support Clause or the federal Establishment Clause. *See id*. Not only does the Compelled Support Clause predate Montana's no-aid provision by about a century, it is a much narrower restriction that permits public money to flow to religious schools so long as it does not fund worship. *Taylor*, 178 A.3d at 323. Additionally, the Compelled Support Clause is not specific to schools. It simply prohibits compelled funding of religious worship wherever it may take place.[7] Finally, the Compelled

---

[6] Those States did not include Vermont or Maine. *See* Blaine Info Central, Becket Fund for Religious Liberty, https://www.becketlaw.org/research-central/blaine-amendments-info-central/ (last visited Oct. 25, 2021).

[7] On the record before it in *Chittenden*, the Vermont Supreme Court determined that religious worship included religious instruction. *Taylor*, 178 A.3d at 320 (citing *Chittenden*, 738 A.2d at 562). This conclusion is consistent

Support Clause grew not out of religious animus, like mini-Blaine Amendments, but out of profound reverence for freedom of religious conscience—a reverence that Jefferson and Madison shared and which informed the First Amendment. *See Chittenden*, 738 A.2d at 556.

### iv. The guidance could not have been more narrowly tailored.

Finally, the adequate-safeguards guidance was narrowly tailored to protect the State's compelling interest in enforcing the Compelled Support Clause's proscription against forced contribution to the religion of others. *See Carson*, 979 F. 3d at 45 (holding Maine's limit on payment of public tuition to nonsectarian instruction narrowly tailored). It emphasized that "Vermont school districts may pay tuition to religiously affiliated schools and may not discriminate against an organization on the basis of religion." Ex. 1 to Cplt. at 2. It suggested that to comply with the Compelled Support Clause, a sending district simply require independent schools accepting tuition to certify that they would not use public funding for worship, religious instruction, or proselytization. *Id*.

This certification procedure could not have been more narrowly tailored. If implemented, it would allow independent religious schools to receive full tuition if they certified they would handle the funds consistent with the Compelled Support Clause. For example, a school might determine that while some or all of its teachers' salaries supported religious instruction, it could accept full public tuition to support its facilities, groundskeeping, transportation, food service, sports equipment, technology, books on secular subjects, and staff not engaged in teaching religion, such as custodians and IT professionals. In other words, the adequate-safeguards guidance would simply ensure public money would not fund "a distinct category of instruction"

---

with the U.S. Supreme Court's recent holdings that teachers at religious schools were "ministers" for the purpose of applying the "ministerial exception" to employment discrimination claims. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2066 (2020); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 190 (2012).

– religious instruction – as in *Locke*, but otherwise would go "a long way toward including religion in its benefits." *Trinity Lutheran*, 137 S. Ct. at 2023–24 (quoting *Locke*, 540 U.S. at 724). As the U.S. Supreme Court observed in *Espinoza*, the narrowness of the proscription in *Locke*—excluding only a category of instruction—militated in favor of its constitutionality. 140 S. Ct. at 2257. Just so here.

> **b.  Plaintiffs' Free Speech claims fail on the merits.**

Plaintiffs' Free Speech claims, to the extent they are aimed at Secretary French, all fail. First, Vermont's statutes permitting school districts to either operate schools or pay tuition do not create a forum for speech—which is fatal to Plaintiffs' Free Speech claims. Next, even if the statutes did create a forum for speech, Plaintiffs' unbridled-discretion claim fails because AOE is not encouraging any individual discretion by school districts over tuition payment. Finally, Plaintiffs' viewpoint- and content-discrimination claims fail because the only restriction AOE's guidance suggested was on the use to which public funds might be put—which would be a constitutional condition on use of government funds.

Plaintiffs' Free Speech claims must all be dismissed because Vermont's statutes allowing districts to tuition students in lieu of operating schools do not create a forum for speech. The statutes exist to provide rural school districts flexibility in how they provide education, not "to encourage a diversity of views from private speakers," as would be necessary to create a forum for speech. *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 206 (2003) (quotation omitted) (holding provision of internet access in public libraries not a forum because it was not intended to encourage diverse expression but rather to facilitate learning). Indeed, as the U.S. Supreme Court held in *Locke*, which concerned a scholarship program that did not allow recipients to use their scholarships to pursue training in devotional theology, the scholarship program was "not a

forum for speech." 540 U.S. at 720 n.3. It observed that "[t]he purpose of the [program] is to assist students from low-and middle-income families with the cost of postsecondary education, not to 'encourage a diversity of views from private speakers.'" *Id*. It therefore dispensed with the argument that the program was an unconstitutional viewpoint restriction on speech because "[o]ur cases dealing with speech forums are simply inapplicable." *Id*.

Likewise, the First Circuit held that a Maine statute limiting payment of public tuition to nonsectarian schools did "not implicate the appellants' speech rights at all" because "[a]s the Supreme Court made clear in *Davey*, state programs to fund general tuition costs are not fora for speech." *Eulitt ex rel. Eulitt v. Maine, Dep't of Educ*., 386 F.3d 344, 356–57 (1st Cir. 2004) (citation omitted); *see also Carson*, 979 F.3d at 46 (same). "The Maine education plan," it held, "deals with the provision of secular secondary educational instruction to its residents; it does not commit to providing any open forum to encourage diverse views from private speakers. Consequently, cases dealing with speech fora . . . are not relevant." *Eulitt*, 386 F.3d at 357.

Likewise here, districts pay tuition to satisfy their obligation to provide an education to their resident students. *See* 16 V.S.A. § 822. This statutory plan exists to satisfy districts' education obligations, not encourage diverse views from private speakers. *See* 16 V.S.A. 828; Cplt. ¶¶ 38, 41-42. As in *Locke*, *Eulitt*, and *Carson*, this statutory scheme does not create a forum for speech.

Next, even if the tuitioning statutes created a forum for speech, Plaintiffs' unbridled-discretion claim would fail. They argue that the "Town Tuition Program gives government officials unbridled discretion to penalize schools for religious speech." Cplt. ¶ 259. This claim does not appear to be directed toward Secretary French, as he has no authority to decide whether a district will tuition a student to a particular school, or under what circumstances, as the Legislature gave that authority to school districts. *See* 16 V.S.A. § 828. Even if directed toward

Secretary French, it would fail because the AOE guidance did not suggest exercising discretion over individual cases. It suggested that "school districts may require a written certification from each approved independent school that accepts tuition to the effect that public funding will not be expended for worship, religious instruction, or proselytization," and then "[a]fter receiving the applicable certification, the district would pay tuition." Ex. 1 to Cplt. at 4. AOE's suggestion was automatic tuition payment upon certification.

Next, Plaintiffs' claims that restrictions on the use of public tuition dollars for religious worship and instruction are viewpoint or content discrimination fail. The only restriction suggested in Secretary French's adequate-safeguards guidance was on the use to which government funds could be put—disallowing only the use of government funds on religious worship and instruction, consistent with the Compelled Support Clause. The government may condition the use to which a subsidy will be put, so long as it does not condition the recipient's activities outside the subsidy's scope. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc*., 570 U.S. 205 (2013) (holding that funding condition requiring recipients to expressly oppose prostitution was not confined to subsidy's scope and so violated Free Speech clause).

For example, the U.S. Supreme Court held that regulations limiting the ability of Title X fund recipients to engage in abortion-related activities did not violate recipients' free speech rights. *Rust v. Sullivan*, 500 U.S. 173, 197-99 (1991). The regulations specified that a recipient could "not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning" or engage in activities that "encourage, promote or advocate abortion as a method of family planning." *Id*. at 179-80. The Court held this was not an unconstitutional restriction on speech but rather a legitimate choice about how public funds should be spent. It explained: "The Government can, without violating

22

the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest" because "[i]n so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Id*. at 193.

Likewise, AOE's adequate-safeguards guidance made clear that religious schools could receive public tuition. It simply suggested that districts ask schools to certify that they would not use public funds for religious worship or instruction. Ex. 1 to Cplt. at 2, 4. It did not suggest limiting what parents or schools might say or do; it just suggested limiting which of their activities would be publicly funded. Funding only education, an activity judged to be in the public interest, without choosing to fund other activities like worship—while in no way preventing recipients from worshipping—would be constitutional. *See Am. Libr. Ass'n, Inc*., 539 U.S. at 206 (holding condition that libraries receiving federal funding had to use Internet filters blocking pornography did not violate Free Speech clause because if they "wish to offer unfiltered access, they are free to do so without federal assistance"); *Harris v. McRae*, 448 U.S. 297, 317 n.19 (1980) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity."); *Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540, 546, 549 (1983) (holding "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right" and dismissing "the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State").

### c. Plaintiffs' Establishment Clause claims fail.

To the extent Plaintiffs intend to bring their Establishment Clause claims against Secretary French, they fail because Plaintiffs lack standing to bring such claims against him; and because he is not favoring or disfavoring a religion or excessively entangled in religion.

First, Plaintiffs lack standing to sue Secretary French under the Establishment Clause. That Clause "is violated by the enactment of laws which establish an official religion whether those

laws operate directly to coerce non-observing individuals or not." *Sch. Dist. of Abington Twp.,*
*Pa. v. Schempp*, 374 U.S. 203, 221 (1963). "[S]tanding to assert an Establishment Clause claim
may rest either on the plaintiff's direct exposure to the challenged activity," such that "students
attending a public school, and their parents, have standing to challenge a program of Bible
reading in the school because they are directly affected by the laws and practices against which
their complaints are directed," or, "in certain situations, on the plaintiff's status as a taxpayer."
*Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 72 (2d Cir. 2001). To the extent Plaintiffs are
espousing a direct-exposure theory, Secretary French is aware of no case law indicating that past
exposure to rescinded, non-binding guidance suggesting that school districts ask independent
schools to certify that they will not use public dollars for worship gives rise to standing under the
Establishment Clause. Plaintiffs are not alleging taxpayer standing. They therefore cannot
establish standing under the Establishment Clause.

Second, Plaintiffs' claim that Defendants "allow" certain religions to be disfavored fails,
as—to the extent this violates any constitutional provision —it does not sound in Establishment
Clause jurisprudence. *See* Cplt. ¶¶ 272-73. As this Court has held: "Although 'Establishment
Clause cases . . . have often stated the principle that the First Amendment forbids an official
purpose to disapprove of a particular religion or of religion in general,' it is the 'Free Exercise
Clause that is dispositive' when what is at issue is not a 'government effort to benefit religion or
particular religions' but rather 'an attempt to disfavor . . . religion.'" *Valente v. French*, No. 2:20-
CV-00135, 2021 WL 3620073, at *14 (D. Vt. Aug. 16, 2021) (alterations omitted) (quoting
*Carson*, 979 F.3d at 48 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508
U.S. 520, 532 (1993)). Therefore, the Establishment Clause's "negative prohibition" on state

establishment of religion is not "a basis for extending the right of a religiously affiliated group to secure state subsidies." *Strout v. Albanese*, 178 F.3d 57, 64 (1st Cir. 1999).

Next, Plaintiffs have not plausibly alleged Secretary French is excessively entangled in religion. They rightly do not allege he "engage[s] in surveillance of private religious schools' activities" or draws "conclusions about what it means for students, parents, and religious schools to exercise their religious beliefs." Cplt. ¶¶ 274-75. AOE simply suggested that districts ask schools to self-certify that they would not use public dollars for worship. Ex. 1 to Cplt. at 4.

But even if Secretary French were requiring such self-certifications, that would not violate the Establishment Clause. For example, *Carson* held that the Maine Department of Education did not violate the Establishment Clause where it required private schools seeking approval for public tuition to self-identify as "sectarian" or "nonsectarian" and the Commissioner explained that "if there is ever a question, the determination of whether a school is secular could readily be made by looking at objective factors such as mandatory attendance at religious services and course curricula." *Carson*, 979 F.3d at 48. The First Circuit held: "Given that the inquiry is undertaken for purposes of ensuring the educational instruction provided by an applicant will mirror the secular educational instruction provided at Maine's public schools, such evidence cannot suffice to supply evidence of the kind of entanglement that could rise to the level of an Establishment Clause violation in this context, if any could." *Id*. Self-certification would no more violate the Establishment Clause here.

### d.  Plaintiffs' Due Process claims fail on the merits.

Finally, Plaintiffs—the Roman Catholic Diocese and Catholics, Cplt. ¶¶ 109-12—argue that the adequate-safeguards guidance was vague and violated due process because the word "religious" eludes their understanding. The guidance stated: "school districts may require a

written certification from each approved independent school that accepts tuition to the effect that public funding will not be expended for worship, religious instruction, or proselytization." Ex. 1 to Cplt. at 4. Plaintiffs, who allege that MSJ is a "religious school," Cplt. ¶ 221, that they exercise their "religion" by operating, attending, and having their children attend a religious school, *see id.* ¶ 131, and that Catholic schools teach "religion," *id.* ¶ 131, argue that to apply this guidance, "[s]chools such as MSJ must guess whether they are engaged in 'religious worship' or 'religious education.'" *Id.* ¶ 285.[8] Plaintiffs offer no explanation of why they find the words "religion" and "religious" comprehensible when describing themselves, when used in the Free Exercise and Establishment clauses, and in *Espinoza*, *see id.* ¶ 1, but drew a blank when faced with the adequate-safeguards guidance.

The guidance's suggestion that districts ask schools to self-certify that they would not use public funds for religious worship and instruction, if implemented, would not be unconstitutionally vague. A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 128 (2d Cir. 2014) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010)). A law is not vague because it requires some exercise of discretion. It need only give "fair warning as to what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972).

"The terms 'religious purpose' and 'religious services and religious instruction' have a common meaning such that people of ordinary intelligence—perhaps after some thought—can understand what conduct is prohibited." *Trinity United Methodist Par. v. Bd. of Educ. of City Sch. Dist. of City of Newburgh*, 907 F. Supp. 707, 718 (S.D.N.Y. 1995); *see also Hills v.*

---

[8] The word "secular" was only used once in the guidance, in a quote from *Espinoza*, a case which Plaintiffs do not allege is incomprehensible to them. Ex. 1 to Cplt. at 2. "Non-secular" was not used. *Id.* at 2-4.

*Scottsdale Unified Sch. Dist. No*. 48, 329 F.3d 1044, 1056 (9th Cir. 2003) ("Although not perfectly clear, the term 'religious' is a common term and does at least provide some degree of constraint" so policy forbidding distribution and display of religious materials was not vague); *Campbell v. St. Tammany's Sch. Bd.,* 206 F.3d 482, 485 (5th Cir. 2000), *vacated on other grounds*, 533 U.S. 913 (2001) (holding "we fail to see how the terms 'religious instruction' and 'religious worship' would provoke confusion amounting to unconstitutional vagueness"; terms were "not even arguably vague"); *Miller v. Wilkinson*, No. 2:98-CV-275, 2010 WL 3909119, at *6 (S.D. Ohio Sept. 30, 2010) (holding "sincerely held religious belief" not vague as "[c]ourts have . . . had little difficulty in determining that the word 'religious' has a common meaning").

Moreover, the rescinded adequate-safeguards guidance invited no arbitrary enforcement because it described no enforcement mechanism by the government. It suggested that districts ask for, and rely on, a certification from the school, which would have resulted in identical implementation in all districts that chose to follow it. *See* Ex. 1 to Cplt. at 4.

## V.      Plaintiffs' request for a preliminary injunction should be denied.

"A party seeking a preliminary injunction must establish 1) a likelihood of success on the merits, 2) a likelihood of irreparable harm absent relief, 3) that the balance of equities was in its favor, and 4) that an injunction is in the public interest." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 188 n.2 (2d Cir. 2019). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation omitted). In deciding a motion for a preliminary injunction, the court need not accept the allegations in the complaint as true. *See Cacchillo v. Insmed, Inc*., 638 F.3d 401, 404 (2d Cir. 2011). The court instead considers the "entire record including affidavits and other hearsay evidence." *Park Irmat Drug Corp. v.*

*Optumrx, Inc*., 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (quotation omitted). Plaintiffs' motion should be denied because they cannot establish either likelihood of success on the merits or likelihood of irreparable harm absent relief against Secretary French.

      **a.   Plaintiffs cannot show likelihood of success on the merits.**

For all the reasons laid out above, Plaintiffs cannot show likelihood of success on the merits against Secretary French. Of particular relevance in the preliminary-injunction context, Plaintiffs lack standing to sue Secretary French because they cannot show that an injunction against him would provide any redress. Such "an inability to establish a substantial likelihood of standing requires denial of [a] motion for preliminary injunction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912-13 (D.C. Cir. 2015). Because Secretary French's adequate-safeguards guidance was rescinded over a year ago, and Plaintiffs cannot show Secretary French has any current or planned guidance or other policy regarding payment of tuition to religious schools, Plaintiffs cannot show how their requested injunction as to Secretary French would have any effect at all. Their claims accordingly fail for lack of redressability.

      **b.   Plaintiffs cannot show a likelihood of irreparable harm absent relief.**

Plaintiffs likewise cannot show a likelihood of irreparable harm absent relief against Secretary French. "The *sine qua non* of entitlement to a preliminary injunction is a showing of irreparable injury." *Medgar Evers Houses Assocs., L.P. v. Carro*, No. 01-CV-6107, 2001 WL 1456190, at \*4 (E.D.N.Y. Nov. 6, 2001) (denying preliminary injunction based on, among other things, lack of irreparable injury because court order would have "no effect"). Secretary French rescinded the guidance Plaintiffs are challenging over a year ago. Plaintiffs cannot show he has reinstated or plans to reinstate that or other guidance on the topic. An injunction forbidding AOE

from promulgating guidance it has no plans to promulgate would have no effect. An injunction against Secretary French would afford Plaintiffs no relief.

Plaintiffs' more than year-long delay in seeking this injunction against Secretary French also underscores the lack of irreparable harm here. Their "claimed need for injunctive relief is" "belied by" their "delay in seeking that relief." *Garland v. N.Y. City Fire Dep't*, No. 21–cv–6586, 2021 WL 5771687, *9 (E.D.N.Y. Dec. 6, 2021) (so finding after considering much shorter 32-day delay). "'Lack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief because it goes primarily to the issue of irreparable harm.'" *Id.* (quoting *Majorica, S.A. v. R.H. Macy & Co., Inc.*, 762 F.2d 7, 8 (2d Cir. 1985)). "'Indeed, in this Circuit, preliminary injunctions have been denied on account of even relatively short delays.'" *Id.* (quoting *Alcon Vision, LLC v. Lens.com, Inc.*, No. 18–cv–407, 2020 WL 5899879, *9 (Feb. 28, 2020)). An unreasonable delay in seeking a preliminary injunction "'may preclude a finding of irreparable harm because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief.'" *Id.* Plaintiffs challenge guidance by AOE that was promulgated and then rescinded over a year ago. They cannot show that now, over a year later, there is an urgent need to restrain AOE.

## CONCLUSION

For the foregoing reasons, Secretary French respectfully requests that the Court dismiss all claims against him and deny Plaintiffs' motion for a preliminary injunction.

DATED at Montpelier, Vermont this 31st day of March 2022.

STATE OF VERMONT

THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL

By:    *Rachel E. Smith*       
       Rachel E. Smith
       Deputy Solicitor General
       Office of the Attorney General
       109 State Street
       Montpelier, VT 05609-1001
       (802) 828-3178
       rachel.e.smith@vermont.gov

       Counsel for Secretary French